

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
08/03/2011

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| KELVIN IKWUNNE OKWONNA-FELIX, | § § § | Case No. 10-31663-H4-13 |
| | § | Chapter 13 |
| Debtor. | § § | |

### MEMORANDUM OPINION REGARDING DEBTOR'S
### MOTION FOR APPROVAL OF COMPROMISE OF CONTROVERSIES:
### INSURANCE BREACH OF CONTRACT CLAIMS AGAINST
### FIRE INSURANCE EXCHANGE a/k/a FARMERS INSURANCE
### AND APPROVAL OF ATTORNEY'S FEES AND COSTS
[Docket No. 60]

## I. INTRODUCTION

This Memorandum Opinion concerns a debtor's right to exempt the proceeds to be paid pursuant to a settlement of a lawsuit against the company insuring the debtor's homestead. The suit involves a breach of contract cause of action where the insurance carrier allegedly failed to pay sufficient proceeds under the policy after Hurricane Ike damaged the homestead. The Debtor did not disclose this lawsuit or seek to exempt any recovery therefrom in his initial Schedules. He failed to disclose despite knowing of his potential cause of action against the insurer. Now that the suit has been prosecuted and a proposed settlement has been negotiated, the Debtor seeks to exempt a portion of the proceeds that the insurer will pay under the terms of the settlement. Thus, the first issue is whether the Debtor, in view of his failure to make initial disclosure of his cause of action against Farmers Insurance, should be allowed to amend his Schedule C to exempt $5,337.50 of the Remaining Proceeds under 11 U.S.C § 522(d)(5). The second issue is if the Debtor is allowed this exemption, should the holder of the lien on the

1

Debtor's homestead nevertheless have control over the exempt proceeds to ensure that they are used solely to repair the Debtor's homestead. Finally, the third issue is whether that portion of the Remaining Proceeds that the Debtor does not seek to exempt—i.e. $5,720.65—should be remitted to the Trustee for distribution to creditors under the confirmed plan in this case, or to holder of the deed of trust lien for it to hold and disburse to those entities who make repairs on the Debtor's homestead.

## II. FINDINGS OF FACT

1. On September 13, 2008, Hurricane Ike struck and damaged the homestead of Kelvin Ikwunne Okwonna-Felix (the Debtor). [Testimony of the Debtor].

2. After Hurricane Ike, the Debtor made a claim on his homeowner's insurance company, Fire Insurance Exchange a/k/a Farmers Insurance (Farmers Insurance). On September 15, 2008, the Debtor estimated his damages on his homestead to be $26,897.00. After the insurance adjuster visited the Debtor's homestead to survey the damage, Farmers Insurance paid the Debtor a total of $7,600.49. [Testimony of the Debtor].

3. On March 1, 2010, the Debtor filed a Chapter 13 bankruptcy petition. [Docket No. 2]. On this date, the Debtor was very unhappy with Farmers Insurance because he believed that Farmers Insurance had failed to pay him sufficient proceeds under his policy to repair the damages to his homestead. [Testimony of the Debtor].

4. On March 9, 2010, the Debtor filed his original Schedules with the Court. [Docket No. 20].

5. In Debtor's Schedule B—Personal Property, the Debtor did not schedule any cause of action against Farmers Insurance. [Schedule B, Docket No. 20].

6. In Debtor's Schedule C—Property Claimed as Exempt, the Debtor listed his homestead as exempt property pursuant to 11 U.S.C. §§ 522(d)(1) and (d)(5).[1] [Schedule C, Docket No. 20].[2]

7. On June 25, 2010, the Debtor, by executing an engagement letter with the law firm of Clark, Burnett, Love & Lee, GP (the Special Counsel), retained the Special Counsel to represent him in connection with his cause of action against Farmers Insurance for its failure to pay the Debtor proceeds to which he believed he was entitled under his insurance policy. [Debtor's Ex. 4]. Neither the Debtor nor the Special Counsel informed this Court of the Debtor's retention of the Special Counsel, nor did they obtain this Court's approval of the terms of the retention. [Testimony of Kara Kellogg]. The Debtor did not inform the Special Counsel at this time that he had filed a Chapter 13 petition on March 1, 2010. [Testimony of Kara Kellogg].

8. On July 19, 2010, the Special Counsel filed suit on behalf of the Debtor against Farmers Insurance for breach of contract (among other claims) in the District Court of Harris County, Texas. [Debtor's Ex. 1]. At this point, the Debtor had still not informed the Special Counsel that he was a debtor in the bankruptcy case pending before this Court. [Testimony of Kara Kellogg].

9. Additionally, the Trustee and the Debtor's general bankruptcy counsel were unaware that the Debtor had a claim against Farmers Insurance and had retained the Special Counsel. [Testimony of the Debtor]. The Debtor did not understand that he needed to amend his Schedules to disclose this claim. [Testimony of the Debtor].

---

[1] Any reference herein to the Bankruptcy Code is a reference to 11 U.S.C. Moreover, any reference to a section is a reference to a section of the Bankruptcy Code.

[2] The Debtor elected the federal exemptions and therefore claimed as exempt the equity that he believes he has in his homestead—which totals $252.53.

3

10. On April 11, 2011, the Debtor, through his Special Counsel, agreed to settle his lawsuit against Farmers Insurance for $20,000.00. [Debtor's Ex. 2].

11. In connection with this April 11 settlement, the Special Counsel first learned of the existence of the Debtor's bankruptcy case. [Testimony of Kara Kellogg]. The Special Counsel became aware of the Debtor's Chapter 13 case when, as the Debtor was departing the mediation that had resulted in the settlement, the Debtor casually asked what he should tell his bankruptcy attorney about the settlement. [Testimony of Kara Kellogg].

12. On April 27, 2011, the Debtor filed an Application to Employ Special Counsel (the Application). [Docket No. 48]. The Application requests that this Court approve the Special Counsel *nunc pro tunc*, such that the Special Counsel receive its fees of $8,000.00 and its expenses of $941.85. [Docket No. 48]. These are the amounts that the Special Counsel would receive (assuming that the proposed $20,000.00 settlement is approved) under the terms of the engagement letter which the Debtor signed when he first retained the Special Counsel in June of 2010. [Docket No. 48].

13. On June 3, 2011, the Debtor filed his Motion for Approval of Compromise of Controversies: Insurance Breach of Contract Claims Against Fire Insurance Exchange a/k/a Farmers Insurance and Approval of Attorney's Fees and Costs (the Motion). [Docket No. 60]. In paragraph seven of the Motion, the Debtor represents that if the proposed $20,000.00 settlement is approved, $8,941.85 would be remitted to the Special Counsel, and the remaining $11,058.15 (the Remaining Proceeds) would be paid jointly

4

to the Trustee and the Debtor's mortgage company, which is JPMorgan Chase Bank, N.A. (Chase).[3] [Docket No. 60].

14. On July 5, 2011, Chase filed a limited objection to the Motion—claiming that, pursuant to the deed of trust, all Remaining Proceeds should be paid directly to Chase to hold and disburse for repairs to the Debtor's homestead. [Docket No. 67]. Chase filed this objection for two reasons: (1) to telegraph to the Debtor that even if this Court allows him to amend his exemptions so that he may exempt the $5,337.50, Chase nevertheless claims a lien on these proceeds and also claims a right to hold these proceeds to ensure that they are used to pay for repairs on the Debtor's homestead (i.e., on Chase's collateral); and (2) to telegraph to the Trustee Chase's view that the $5,720.65 (which the Debtor does not seek to exempt) should not be remitted to the Trustee for distribution to creditors, but rather, that these funds (in addition to the $5,337.50, which the Debtor claims as exempt) should also be used to repair the homestead—i.e., to repair Chase's collateral and thereby preserve, if not enhance, the value of its collateral. [Docket No. 67].

15. On July 8, 2011, in Debtor's Amended Schedule B—Personal Property, the Debtor added a breach of contract claim against Farmers Insurance in the amount of $20,000.00. [Amended Schedule B, Docket No. 70]. This asset was not included in his original Schedule B. [Schedule B, Docket No. 20].

16. On July 8, 2011, in Debtor's Amended Schedule C—Property Claimed as Exempt, the Debtor claimed as exempt $5,337.50 of the Remaining Proceeds pursuant to 11 U.S.C. §

---

[3] It is worth noting, however, that in the prayer paragraph of the Motion, the Debtor requests that the Remaining Proceeds be disbursed **not** jointly to the Trustee and Chase, but rather "to the Chapter 13 Trustee, pending any claim of exemption by the Debtor in resolution of that claim after objection, if any." [Docket No. 60]. Thus, the Motion is contradictory in a very important respect; just exactly who receives the Remaining Proceeds?

5

522(d)(5). [Amended Schedule C, Docket No. 70]. This exemption was not claimed in his original Schedule C. [Schedule C, Docket No. 20].

17. On July 11, 2011, this Court held a hearing on both the Application and the Motion. At this hearing, counsel for the Trustee informed the Court that the Trustee opposed neither the Application nor the immediate payment of $8,941.85 to the Special Counsel. Furthermore, counsel for the Trustee informed the Court that the Trustee did not oppose distribution of the $5,337.50 of the Remaining Proceeds to the Debtor pursuant to his amended exemption under § 522(d)(5). The Trustee's counsel opposed any distribution of the Remaining Proceeds to the Debtor, with the exception of the $5,337.50 that the Debtor now claims is exempt. Indeed, counsel for the Trustee took the position that the other $5,720.65 should be remitted to the Trustee for distribution to creditors under the confirmed plan.[4] [July 11, 2011 hearing]. Stated differently, the Trustee telegraphed to Chase and the Debtor that the Trustee believes none of $5,720.65 should go to repair the homestead (which would preserve, if not enhance, the value of Chase's collateral and the Debtor's property). Instead, the proceeds should go to the Trustee for distribution to the Debtor's creditors pursuant to the confirmed plan.[5]

18. At the July 11, 2011 hearing, the Court approved the Application. [Docket No. 74]. However, the Court decided that it wanted to reflect on the Motion and therefore continued the hearing on the Motion until August 8, 2011.

---

[4] On June 21, 2010, this Court confirmed the Debtor's Chapter 13 plan. [Docket No. 36].

[5] The Trustee, knowing that the twin pillars of bankruptcy are that the debtor receives a discharge and that claims should be paid, is obviously focused on the latter objective by trying to maximize payment of claims in this case. *See Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 188 B.R. 799, 807 (E.D. La. 1995), *aff'd* 116 F.3d 790 (5th Cir. 1997).

### III. CONCLUSIONS OF LAW

A.  **Jurisdiction, Constitutional Authority to Sign a Final Judgment, and Venue**

The Court has subject matter jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This particular matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), and (O).

Having made this conclusion of law as to jurisdiction, this Court nevertheless notes that the Supreme Court has recently issued its watershed opinion in *Stern v. Marshall*. 131 S. Ct. 2594 (2011). This decision sets forth certain limitations on the constitutional authority of bankruptcy courts to enter final judgments. The undersigned judge is therefore required to analyze whether he has the constitutional authority to enter a final order in this contested matter.

*Stern* concerned a bankruptcy court's authority over a debtor's common-law counterclaim to a proof of claim filed against the estate. *Id.* at 2600–01. The debtor's counterclaim was a core proceeding under 28 U.S.C. § 157(b)(2)(C)—which, up until *Stern*, was a dispute in which a bankruptcy court could sign a final judgment in accordance with to 28 U.S.C. § 157(b)(1). *See id.* In *Stern*, the Supreme Court held that contrary to § 157(b)(1), a bankruptcy court may not constitutionally enter a final judgment on a counterclaim that would not necessarily be resolved through adjudication of the proof of claim. *Id.* at 2611. Importantly, the particular counterclaim in *Stern* did not constitute a "public rights" dispute. *Id.* A "public rights" dispute may be decided by non-Article III tribunals, but such dispute must involve rights "integrally related to a particular federal government action." *Id.* at 2613. Entering a final judgment with respect to the counterclaim based upon a private right would be an impermissible exercise of the judicial power of the United States. *Id.* at 2615.

The broader applicability of the Supreme Court's decision remains unclear. Other types of disputes where bankruptcy courts have frequently entered final judgments may now require that an Article III court enter the final judgment. Indeed, a bankruptcy court's authority to enter a final judgment over certain disputes involving state law issues is now questionable. For the reasons set forth below, the undersigned judge concludes that he does have constitutional authority to enter a final order in the dispute at bar.

In *Stern*, the suit between the debtor's estate and the creditor concerned purely state law issues. *Id.* at 2611. In the dispute at bar, the Debtor is requesting this Court to approve a settlement under an express bankruptcy provision, i.e. Bankruptcy Rule 9019. This Rule gives bankruptcy courts discretion to approve a compromise. State law has no equivalent to Bankruptcy Rule 9019. Moreover, the factors which bankruptcy courts are required to review in making a determination of whether or not to approve a settlement have been developed entirely by the federal courts, including the Supreme Court of the United States. *See United States v. Key*, 397 U.S. 322 (1970); *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980). Accordingly, because the resolution of the Motion is not based on state common law, but entirely on federal bankruptcy law (both the Rule and the case law instructing how to apply the Rule), the holding in *Stern* is inapplicable, and this Court has the constitutional authority to enter a final order in this contested matter pursuant to 28 U.S.C. §§ 157(a) and (b)(1).

Alternatively, even if this Court is incorrect and *Stern* does govern, this Court concludes that the one exception articulated by the Supreme Court applies. Specifically, the Court concludes that it may exercise authority over essential bankruptcy matters under the "public rights" exception. Under *Thomas v. Union Carbide Agric. Prods. Co.*, a right closely integrated

into a public regulatory scheme may be resolved by a non-Article III tribunal. 473 U.S. 568, 593 (1985). The Bankruptcy Code is a public scheme for restructuring debtor-creditor relations, necessarily including "the exercise of exclusive jurisdiction over all of the debtor's property, the equitable distribution of that property among the debtor's creditors, and the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts." *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363–64 (2006); *see N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71 (1982) (plurality opinion) (noting in dicta that the restructuring of debtor-creditor relations "may well be a 'public right'"). *But see Stern*, 131 S. Ct. at 2614 n.7 ("We noted [in *Granfinanciera*] that we did not mean to 'suggest that the restructuring of debtor-creditor relations is in fact a public right.'").

In determining whether to approve the proposed settlement in the Motion, a key issue before this Court involves a dispute over whether or not property of the estate is exempt. The right to exempt property from the bankruptcy estate is established by the Bankruptcy Code and is central to the public bankruptcy scheme, as it relates to both the exercise of exclusive jurisdiction over the debtor's property (because before property is deemed exempt, it is property of the estate[6]) and the equitable distribution of that property among the debtor's creditors. *See Katz*, 546 U.S. at 363–64 (noting that a discharge is among the "[c]ritical features" of a bankruptcy proceeding). As such, this determination is not only inextricably tied to the bankruptcy scheme, but it also involves the adjudication of rights created by the Bankruptcy Code.

For all these reasons, this matter falls within this Court's authority, and therefore this Court may enter a final order on the Motion.

Venue is proper pursuant to 28 U.S.C. § 1408.

---

[6] For a more detailed discussion of just exactly how and when property of the estate becomes exempt property, see *Calvin v. Wells Fargo Bank, N.A. (In re Calvin)*, 329 B.R. 589 (Bankr. S.D. Tex. 2005).

B.  **The Debtor's Amended Exemption of $5,337.50 Will Be Allowed.**

Based upon representations and arguments made at the July 11, 2011 hearing, the Trustee does not object to the Debtor exempting the $5,337.50. [Finding of Fact No. 17]. It does appear from Chase's conditional objection, however, that Chase wants all of the Remaining Proceeds (i.e., $11,058.15) to be used for repairing the homestead. [Finding of Fact No. 14]. Stated differently, Chase objects to the Debtor exempting $5,337.50 to the extent that the Debtor wants to use those proceeds for something other than repairs to his homestead. [Finding of Fact No. 14]. Accordingly, this Court will first address whether the Debtor's amended exemption of the $5,337.50 should be allowed.

Amendments to exemptions are generally and liberally allowed under Bankruptcy Rule 1009. Fed. R. Bankr. P. 1009(a) ("A voluntary petition, list, schedule, or statement may be amended by the debtor *as a matter of course at any time before the case is closed.*") (emphasis added). The debtor's right to amend schedules is not absolute. An exception to this general rule is that "if there is a showing of the debtor's bad faith or of prejudice to the creditors," an amendment may be denied. *Unruh v. Tow (In re Unruh)*, 265 F. App'x 148, 150 (5th Cir. 2008) (quoting *Stinson v. Williamson (In re Williamson)*, 804 F.2d 1355, 1358 (5th Cir. 1986)).[7] A bankruptcy court must meet this "difficult standard" to justify denying a debtor the right to amend his schedules. *McFatter v. Cage*, 204 B.R. 503, 509 (S.D. Tex. 1996).

---

[7] The Fifth Circuit has applied this liberally construed general rule since at least 1969. *In re Williamson*, 804 F.2d at 1358 (citing *Thompson v. Powell*, 413 F.2d 276, 277 (5th Cir. 1969)). In 1986, the Fifth Circuit adopted the Eleventh Circuit's rule that "a court may deny leave to amend if there is a showing of the debtor's bad faith or of prejudice to the creditors." *In re Williamson*, 804 F.2d at 1358 (quoting *Doan v. Hudgins (In re Doan)*, 672 F.2d 831, 833 (11th Cir. 1982)).

10

1.     The Debtor Did Not Act in Bad Faith.

If the Debtor acted in bad faith in amending his Schedules, the Court may deny the amendment. *Unruh* provides a definition of bad faith. 265 F. App'x at 150. *Unruh* concluded that a "finding of bad faith requires some form of deception, such as an effort to mislead creditors or to conceal assets, as opposed to a mere mistaken failure to list an asset or to claim an exemption." *Id.* (citing *McFatter*, 204 B.R. at 508–09 ) (concluding that a debtor's mere silence as to his intent concerning the questionable asset's classification as a homestead was insufficient to show bad faith).[8]

Here, the Debtor was merely silent as to his cause of action against Farmers Insurance. [Finding of Fact Nos. 7, 8 & 9]. The Debtor was not intentionally deceptive; rather, the Debtor testified that he did not fully understand the need to notify the Court of potential causes of action. [Finding of Fact No. 9]. Based on the "difficult standard" necessary to show bad faith, both the Debtor's failure to initially disclose his potential cause of action when he filed his original Schedules in March of 2010 and the Debtor's failure to make an amendment upon filing a claim against Farmers Insurance in July 2010 were "mistaken failures" rather than deception. *See McFatter*, 204 B.R. at 508–09 . Therefore, the Debtor did not act in bad faith.

Even if a finding of bad faith is a close call, the Fifth Circuit has a long history of giving the benefit of doubt to the debtor with respect to the homestead exemption. *See State Farm Life Ins. Co. v. Swift (In re Swift)*, 129 F.3d 792, 801 (5th Cir. 1997) ("Texas courts construe the scope of exemptions liberally, with most doubts about the existence of an exemption resolved in favor of the debtor claiming the exemption."). Although the matter at bar is not a typical homestead exemption dispute—but rather a dispute over who is entitled to receive proceeds from

---

[8] *Unruh* also broadens the definition of bad faith to include not only a concealment, but also "a gross and deliberate understatement of the value of an asset, made in an attempt to deceive creditors or the bankruptcy court." *In re Unruh*, 265 F. App'x at 150.

11

the settlement of a lawsuit involving the insurance policy of a homestead—because the dispute could not have arisen but for the existence of the Debtor's homestead, this Court believes that it should take into account the Fifth Circuit's lengthy history of favoring homestead exemptions in concluding that the Debtor did not act in bad faith.

2. The Creditors Were Not Prejudiced.

In the alternative, the Court may also deny the amended exemption if creditors have been prejudiced as a result of the Debtor's failure to disclose. In the Fifth Circuit, this analysis must focus on the harm to the creditors' litigating posture caused by some detrimental reliance on the Debtor's initial position. *In re Williamson*, 804 F.2d at 1358. Prejudice to the creditors' litigation posture "does not occur merely because an amendment, if properly allowed, permits the debtor to assert a claim that ultimately prevails on the merits." *Id.*

Here, it has not been shown that the creditors—or the Trustee acting on their behalf—relied on the Debtor's initial position in choosing a litigation posture. There is no evidence that the Trustee or the creditors relied on the Debtor's original Schedules in choosing a litigation route. Accordingly, there has been no showing that the Trustee or the creditors were prejudiced.

In sum, because the Debtor's failure to initially exempt his cause of action against Farmers Insurance neither constitutes bad faith nor prejudices creditors, this Court concludes that the Debtor should be allowed to amend his exemptions to exempt the amount of $5,337.50 pursuant to 11 U.S.C. § 522(d)(5).[9] Accordingly, the Court accepts the amended Schedule C

---

[9] 11 U.S.C. § 522(d)(5) allows a debtor to exempt the aggregate interest in any property, not to exceed in value $1,075.00 plus up to $10,125.00 (i.e. $11,200.00 in total) of any unused amount of the exemption provided in subsection (d)(1). Since the Debtor only claimed as exempt $252.53 of the available $20,200.00 under subsection (d)(1), the entire exemption amount of $11,200.00 under subsection (d)(5) is available to the Debtor. In his original Schedule C, the Debtor claimed as exempt $5,862.50 worth of property under subsection (d)(5). Thus, when the Debtor amended his Schedule C, he had an available $5,337.50 of subsection (d)(5) exemptions left. This is why the Debtor did not attempt to exempt more of the proceeds from the breach of contract claim against Farmers Insurance on his Amended Schedule C—the Debtor had already maximized his (d)(5) exemptions.

which the Debtor filed on July 8, 2011, and this amendment supersedes the original Schedule C.[10]

Simply because the Court has decided to allow the Debtor to exempt the $5,337.50 does not, however, mean that these monies should be paid to the Debtor for his unfettered use. Chase still has an interest in these proceeds and a large voice in how the proceeds are to be used. Indeed, Chase not only has a say as to how the exempt proceeds are to be used, but also has a large role in how the non-exempt portion of the Remaining Proceeds—i.e., $5,720.65 are to be used.

C.  **Even Though the Debtor May Exempt the $5,337.50 Under § 522(d)(5), the Deed of Trust Held by Chase Grants it a Lien on These Proceeds, Plus the Other $5,720.65.**

1.  Discussion Regarding the $5,337.50.

The Debtor is not the only party in this dispute who has an interest in the Remaining Proceeds. Chase has a first lien on the Debtor's homestead pursuant to the deed of trust. [Chase Ex. No. 2, p. 2]. It also has a first lien on the proceeds of any settlement paid by a third party, which in this case is Farmers Insurance. Section 11 of the deed of trust expressly assigns a security interest in the settlement proceeds to Chase.[11] [Chase's Ex. No. 2, p. 8]. Thus, although the Debtor has the right to exempt the $5,337.50, the Debtor does not have the unfettered use of these proceeds. Because Chase has a lien on these proceeds, Chase has a say in how these proceeds are to be used.

---

[10] The Court also accepts the Debtor's amended Schedule B, which the Debtor also filed on July 8, 2011. [Docket No. 70]. This Schedule discloses the existence of the Debtor's breach of contract claim against Farmers Insurance.

[11] "All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender. If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if restoration or repair is economically feasible and Lender's security is not lessened. . . . If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower." [Chase's Ex. No. 2 p. 8].

And, indeed, Chase's voice in this matter is set forth in the deed of trust signed by the Debtor. The deed of trust held by Chase, in pertinent part, sets forth the following:

> Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.

[Chase's Ex. No. 2, pp. 5–6].

The language cited above reflects that Chase has more than an abiding interest in ensuring that the value of its collateral (i.e., the Debtor's homestead) is maintained, if not enhanced. The language in the deed of trust leaves no doubt that Chase has the contractual right to hold the $5,337.50, so long as repairs are being made to the Debtor's homestead. Chase has the discretion to disburse the proceeds from time to time as repairs are completed.[12] Thus, while the Debtor has the right to exempt the $5,337.50 pursuant to § 522(d)(5), this right is not unfettered. The $5,337.50 will not be remitted to the Debtor for his use at any time and for

---

[12] The provision cited in the deed of trust above expressly concerns proceeds paid by an insurance carrier pursuant to a policy, as opposed to pursuant to a settlement of a lawsuit where the insured has sued the carrier for failure to pay sufficient amounts under the policy. The Court notes this distinction because the deed of trust clearly grants a lien to Chase on proceeds from the settlement of any lawsuit; whereas, the deed of trust is not as clear as it could be in granting Chase a lien on proceeds paid by an insurance carrier where no lawsuit is involved. Nevertheless, in the paragraph of the deed of trust which grants the security interest in the real estate, there is also a sentence that reads as follows: "All replacements and additions shall also be covered by this Security Instrument." [Chase's Ex. No. 2, p. 2]. Case law has held that such language suffices to grant the lien holder of a homestead a security interest in proceeds paid by an insurance carrier for damage to the homestead. *Altegra Credit Co. v. Ford Motor Credit Co. (In re Brantley)*, 286 B.R. 918, 922–23 (Bankr. S.D. Ga. 2002). Although the *Altegra* court was applying Georgia law, the Uniform Commercial Code section relied upon by that court has also been adopted by the Texas legislature. *See* Tex. Bus. & Com. Code §§ 9.203 and 9.315. Accordingly, this Court concludes that Chase holds a lien on the proceeds to be paid by Farmers Insurance regardless of whether those proceeds are construed under the deed of trust as proceeds paid from a settlement of a lawsuit or proceeds paid under the Debtor's insurance policy. For example, Farmers Insurance paid $7,600.49 to the Debtor soon after Hurricane Ike damaged his homestead. [Finding of Fact No. 2]. This payment represented proceeds paid from an insurance policy where there was no lawsuit involved. Under the *Altegra* holding, the language in the deed of trust held by Chase gave a lien to Chase on these proceeds.

anything. Rather, Chase will hold the funds and ensure that they are used to make repairs on the Debtor's homestead, which also happens to be Chase's collateral. In this matter, not only are the statutory rights under § 522(d)(5) of the Debtor protected; so are the contractual rights of the home lender, Chase.

2. Discussion Regarding the $5,720.65.

What remains to be decided is what happens to the $5,720.65 that the Debtor has not exempted—and may not exempt because he has no more room under § 522(d)(5). The Trustee takes the position that because these proceeds are non-exempt proceeds, Farmers Insurance should remit these proceeds to the Trustee for distribution to creditors pursuant to the confirmed plan in this case. [Finding of Fact No. 17]. Chase, however, vigorously opposes the Trustee. Chase argues that the rights that it has under the deed of trust dictate that Farmers Insurance must remit the proceeds to Chase to ensure that the funds are used to pay for repairs to the homestead. [Finding of Fact No. 14].

Because this Court has already concluded that Chase has a valid lien on the proceeds presently held by Farmers Insurance, the Court rejects the Trustee's argument that he should receive the funds and distribute them to creditors under the plan. These funds are simply proceeds of Chase's collateral, and their use is dictated by the deed of trust. As this Court has already noted above, the deed of trust requires that Chase hold the proceeds to ensure that payment is made for repairs on the homestead. Accordingly, Farmers Insurance must not only remit the $5,337.50 to Chase, it must also remit the $5,720.65 to Chase.

IV. CONCLUSION

Actually, because it is the Debtor who has the insurance policy with Farmers Insurance, the check from Farmers Insurance must be made payable not only to Chase, but also to the

Debtor. However, it will be Chase which holds the proceeds, ensuring that all of these monies are used to pay solely for repairs on the Debtor's homestead. And, indeed, the Debtor may not come back to court to say that he does not need all of the Remaining Proceeds to make repairs and wants to use some of these monies—at least that portion which he has exempted—for other purposes. The Debtor is bound by his estimate that damages to his homestead are $26,897.00. [Finding of Fact No. 2]. As the Debtor received only $7,600.49 from Farmers Insurance soon after Hurricane Ike, the Debtor's own calculation shows that he needs another $19,296.51 to completely repair his homestead. [Finding of Fact No. 2]. Unfortunately for him, the Remaining Proceeds total only $11,058.15. [Finding of Fact No. 13]. Nevertheless, at least this amount of proceeds is available to make further repairs on his homestead. He will have to do so, however, under Chase's supervision. While this approach may be unpalatable to the Debtor, he should feel quite satisfied with this result, as he initially failed to disclose his cause of action against Farmers Insurance.

Indeed, it is no small irony that the net result of this dispute causes **all** of the Remaining Proceeds to benefit the Debtor, even though he initially failed to disclose the cause of action and § 522(d)(5) itself limits his exemption to $5,337.50 of the Remaining Proceeds. It is a good thing that the Debtor's lender has looked out for its own interests; Chase's active involvement has redounded to the Debtor's advantage. While the Court is sympathetic to the Trustee's position that the Debtor should not be rewarded for his failure to disclose, the cold hard fact is that Chase has a properly perfected lien on the Remaining Proceeds. Therefore, even if this Court had held that the Debtor could not exempt the $5,337.50, the Court still would have ruled that all of the Remaining Proceeds should be paid to Chase. Chase's deed of trust lien bars the Trustee from using these proceeds to pay other creditors under the Debtor's confirmed plan.

At the hearing on July 11, 2011, the Trustee seemed to take the position that the proposed settlement should be approved because some of the proceeds (i.e., $5,720.65), as non-exempt funds, would be used to pay creditors of the Debtor's Chapter 13 estate. Given the Court's ruling, the Trustee will receive no monies under the proposed settlement; therefore, unsecured creditors receive absolutely no benefit under the proposed settlement. Accordingly, the Trustee may contend that this settlement is not beneficial to the creditor body of this Chapter 13 estate, and, therefore, the Motion should be denied. Of course, the Fifth Circuit has made it clear that with respect to approving settlements under Bankruptcy Rule 9019, bankruptcy courts must focus on "the paramount interest of creditors with proper deference to their reasonable views." *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mort. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Accordingly, at the continued hearing on August 8, 2011, the Court will afford the Trustee the opportunity to argue that the proposed settlement should not be approved because it is not in "the paramount interest of creditors with proper deference to their reasonable views."

An order consistent with this Memorandum Opinion will be entered on the docket simultaneously with the entry on the docket of this Opinion.

Signed on this 3rd day of August, 2011.

Jeff Bohm
United States Bankruptcy Judge